WILLIAM M. BALL v. WILLIAM HUNT PHELAN ET AL.

[47 South. 956.]

1. WILLS. *Construction. Intention of testator.*

In construing a will the court must ascertain the intention of the testator from the whole scheme of the instrument, giving due weight to every word of it.

2. SAME. *Devises by implication. Validity.*

There can be no devise by implication violative of law or public policy.

3. SAME. *Same.*

A devise by implication must be predicated of a necessary implication, and the probability of testator's intention to make the gift must be so strong as to exclude the idea that the contrary intention existed in his mind.

4. SAME *Same.*

The rule that a testamentary gift to a person and in case he die without leaving children to another does not raise an implied gift in the children applies only where the first taker is given an absolute interest in the property.

5. SAME. *Construction. Intention of testator.*

The court in construing a will may assume that testator, dictating the will under the influence of family relations, will seldom intentionally cut off the issue of a son or daughter from taking the share of the parent for the benefit of collateral objects.

6. SAME. *Devise by implication.*

Where a will necessarily confines the interest of a child of testator to his life, the court will lay hold of slight circumstances to raise a gift in the issue of such child, and thereby avoid imputing to the testator the intention of giving the property to the devisee over, leaving no provision for the issue of the tenant for life.

7. SAME. *Same.*

Courts will more readily sustain a devise by implication to children on arriving at age or marriage, where some beneficial interest has been given them during minority, than where no interest of

any kind has been given them, but whether a devise by implication is to be maintained or not cannot be determined by such test alone.

8. SAME. *Construction. Law governing.*

Though title to real estate is governed solely by the law of the place where the property is situated, yet, where the inquiry is directed to the ascertainment of the intention of the testator from the language of his will, the *lex domicilii* controls.

9. SAME. *Same.*

Where a testator has used in his will technical terms to which the courts of his domicile have attached a settled judicial meaning constituting a rule of property in that state, the courts of other states construing the testament will give to such words the same meaning.

10. SAME. *Same.*

Where the intention of testator violates no law, it stands; but where it violates the law, the will fails unless the legislature has arbitrarily provided, or the courts have by long construction determined, that a certain meaning shall be given to certain technical terms used in the will, which meaning will save the will, though it may result in a different disposition from that which testator intended.

11. SAME. *Same.*

Where testator gave half of his property to his wife for life, then to his daughter, and the other half to the daughter for life, and provided that on her death without issue, or on the death of the issue before marriage or becoming of age, the whole property given to the daughter "all for life" should go to others. The daughter took only a life estate, which could not be enlarged by construction into a fee on the birth of issue, and her children by implication took the fee.

FROM the chancery court of Tunica county.

HON. PERCY BELL, Chancellor.

William Hunt Phelan and others, appellees, were complainants in the court below; William M. Ball, appellant, was defendant there. From a decree overruling defendant's demurrer to the bill of complaint, the defendant appealed to the supreme court. The opinion of the court states the facts.

*Julian C. Wilson* and *W. A. Percy,* for appellant.

It is immaterial whether the daughter, Julia, mentioned in the second and third items of the will of William R. Hunt, deceased, took a fee defeasible on dying without children or in case her children should die before marrying or becoming of age. As this daughter, Julia, was the sole heir of William R. Hunt, and the appellant, Ball, is shown to have a conveyance from Mrs. Sarah E. Hunt, the widow, and Julia, the daughter, then in either event Julia, having conveyed her interest, would have cut off the inheritance of her own children by her deed. In other words, any claim of appellees must be under the will as purchasers.

If Julia took a fee, either defeasible or absolute, under the will, or, if she, as heir of her father, inherited the part undisposed of, then the appellees could only claim from her by descent and are barred by her conveyance through which appellant claims. *Harris v. McLarin,* 30 Miss. 535; *Halsey v. Gee,* 79 Miss. 193, 30 South. 604.

There can only be five possible constructions to this will as to the estate devised. They are:

(1) An estate to Julia for life, and to her heirs after her death, with limitation over in default of children or in the event of children dying unmarried. As words of inheritance were not necessary to convey a fee, and as the rule in *Shelley's case* was in force in Mississippi in 1872 when the testator died, this construction would have given Julia a fee-simple estate. In this event, her deed conveyed such estate to appellant and thus would dispose of appellees' bill and have the effect of sustaining the demurrer. (2) The second construction is that an estate was devised to Julia for life and to the heirs of her body after her death, and, in default of such heirs, then over. The probability of this being the intention of the testator is very strong because of the provision in the second item of the will that Julia's husband was not to inherit in any manner whatever. This would create an estate tail under the rule in *Shelley's case*

then in force, and under the statute in Mississippi such estate tail would become a fee-simple to Julia, and her death would bar her heirs, the appellees, now suing. This also would have the effect of sustaining the demurrer to the bill. *Presgrove v. Comfort,* 58 Miss. 655; *Harris v. McCann,* 75 Miss. 822, 23 South. 631. (3) The third construction is that an estate was devised to Julia for life and to her issue after her death, and in the event that she died without issue, or if the issue died under age or unmarried, then over. If, under the decision of *Jordan v. Roach,* 32 Miss. 500, the word "children" does not mean issue, then it must be the intent of the will that, if Julia had a child who died in her lifetime leaving children, these children are cut off in favor of the niece of the testator's wife. If on the other hand the word "children" refers to issue, then Julia's grand-children surviving their parent, who died before Julia, would inherit the property in preference to Betty Hunt Selden. This would accomplish the purpose the testator expressed that Julia's husband should not inherit in any manner, because it would mean a general failure of issue. In any event, if Julia's grand-children take in preference to Betty Hunt Selden, the provision in the will would read thus: "in case Julia die without issue, or the issue die before coming of age or marrying, then the property is to go to Betty Hunt Selden." If this is the mean-ing of the will, the failure of issue mentioned is an indefinite failure of issue, and is an implication of an estate tail, if any-thing. 1 Underhill on Wills, § 471. This construction would vest the fee-simple title in Julia under *Jordan v. Roach, supra,* and under the statute making estates tail estates in fee-simple. Therefore the death of Julia would bar her heirs and the demur-rer would be sustained. (4) The fourth construction of the will would be that an estate was granted to Julia only for life with contingent remainder to Betty Hunt Selden. If the con-tingency should never arise, there must be a case of partial in-testacy as to the remainder upon the death of Julia. If this event Julia as heir, had the reversion. As she disposed of it by her deed the title became vested in Ball, and thereby her

heirs, the appellees, are barred from inheritance. This of course would also sustain the demurrer to the bill. 1 Redfield on Wills, 454. (5) The fifth possible construction of the will is that the other constructions and theories above mentioned are morally impossible, and that the will expressly gave a life estate to Julia, and expressly provided for every other contingency, but that there was left to unavoidable implication a remainder to the children of Julia in fee. If this should fail, then the bill must fail.

. There are disclosed no devises or gifts of any character to the children of Julia and no evidence that in any event they were to be the objects of the testator's bounty. The only mention of them is by way of prevention of inheritance of property by Julia's husband, even through them or for lack of them. This furnishes the clue to the mention of children in the will, and seems a bar to the implication of a devisee which can only arise where no other intention is supposable in the mind of the testator. 1 Underhill on Wills, 112; 1 Redfield on Wills, 434; 30 Am. Eng. Ency. Law (2d ed.), 697; 2 Jarman on Wills, 115.

The will was carefully drawn, and written item by item. It contained no statement of intention to dispose of all of the testator's property. No solicitation is expressed therein for the children of Julia. Julia, when the will was made, was unmarried, hence the testator did not know whether he would ever have any grandchildren, and certainly he could have had no personal affection for them. Furthermore, the will was made in Tennessee, and shows a careful avoidance of the common law and of all the Tennessee rules against perpetuities. Next to a provision for his wife and a provision for Julia, the testator's leading idea seems to be the prevention of Julia's husband ever taking this property by his marriage or inheritance. Considering that the will was so carefully drawn, it would be a very dangerous thing for a court after all these years to ascribe to the testator an intention which he did not express. *Caldwell v. Willis,* 57 Miss. 571.

The testator lived in Tennessee, owned property there, and

in his will must be supposed to be speaking in view of the Tennessee law. In determining the intention of the testator the law of the state of his domicile will control, not only as to personality but as to realty. Wharton on Conflict of Laws, 2 vol. 1336; *Crusoe v. Butler,* 36 Miss. 173; *Wilson v. Cox,* 49 Miss. 543; *Adams v. Farley,* 18 South. 391. In Tennessee the husband of a married woman takes an estate by curtesy in a determinable fee. *Crumley v. Deake,* 67 Tenn. 673.

In this will there are only three expressions from which the implication of an estate to the children of Julia can by any possibility arise. They are: 1. The provision in the second item that the husband of Julia was not to inherit through the death of any child or children they may have, or in any manner whatever. 2. The provision in the third item that in case Julia should die without child, the property should go to Betty Hunt Selden. 3. The provision in the third item that in case the child or children should die before marrying or becoming of age, the property should go to Betty Hunt Selden.

The first provision is easily explainable on the ground that the testator was providing against the possibility of an inheritance of Julia's future husband from her future children, in the event they should inherit from Julia as her heirs, if Julia should die first leaving children.

In the second provision just mentioned, if Betty Hunt Selden had been the heir of the testator, and Julia not the heir, the estate by implication would have arisen in the children, because as the heir was not to have the property if children were alive, no one but the children could take it. This would have been necessary implication. As Betty Hunt Selden was not his heir, and his heir could take the reversion if the children did survive, an estate by implication does not arise. The intent to benefit the children as purchasers is only conjectural, which is never sufficient to create a devise by implication. An intent that they should inherit from their mother as her heirs is equally probable. If it is even possible, there would be no

estate by implication. *Norfleet v. Callicot,* 90 Miss. 227, 43 South. 616; 1 Underhill on Wills, 622; *Kinsella v. Caffrey,* 11 Irish Ch. 154.

The third provision, above referred to, under which the implication of an estate to the children of Julia can by any probability arise, is a prevention making a gift to Betty Hunt Selden, a stranger to his blood, dependent on an alternative event. In the contingency of Julia dying without child, or if any child surviving her should die unmarried before reaching majority, Betty Hunt Selden should inherit. But for this provision in the second item of the will, if Julia died and her children inherited from her, the children could neither devise the property until they should arrive at their majority, nor have issue to inherit it until they were married.

It will be noted that the children are mentioned in all three of the items to prevent an inheritance from Julia, if she died without children, and to prevent an inheritance from them in the event they should die unmarried before reaching the age of twenty-one years.

An examination of the authorities will show that, even where no other plausible intention is suggested for the testator, they do not raise an estate by implication to the children from a will, to one for life, and on death, without issue, or the issue dying under age or unmarried, a limitation over. It is a contingency upon which the limitation over takes effect, and is an entirely different case from a conveyance to one until children become of age or marry, or a gift to children until they become of age or marriage; and in the event of death under age, or unmarried, over.

In this case, there is no gift anywhere to the children, nor is the property held for them, nor until a certain time. But there is a bare contingency that the property go to Betty Hunt Selden, in the event they die before they can have issue or dispose of the property. The object of which is made clear by the express desire to prevent inheritance by the father of the chil-

dren.    It is conceded that if Betty Hunt Selden were the testator's heir, there would be an implication because if the heir was not to take, if the children survived and married, then the implication would be necessary and unavoidable that the children took.    As Betty Hunt Selden was not the heir, the implication is not necessary, and, therefore, does not arise.    Jarman on Wills, 126.

No case can be found in a will like this which will support a gift by implication, simply because the testator provided for a disposition of the property in the event that the children of his heir die under majority and unmarried, and the cases which approach it are all decided upon some other principle. They are either supported by the context of the will, by a charge against the supposed devisees, by a gift over to the heir, by the claimed devisee having already an estate in the property to be enlarged, by at least his being the object of the testator's bounty as to the property claimed in the will itself, or some other circumstances other than being mentioned in a contingency so readily explainable.

Under the decisions of *Owen v. Hancock,* 38 Tenn. 564, and *Nott v. FitzGibbon,* 107 Tenn. 54, this cause must be remanded. We especially urge the court to examine the many citations referred to in those two Tennessee decisions.

The mention of the children of the daughter, Julia, three times in the will does not, under any of the authorities, and especially under the Tennessee law, which controls, give an estate by implication to those children.    The fact that Julia was testator's sole heir, and Betty Hunt Selden not his heir, differentiates this case from any where an estate by implication has been sustained, and from any desire of the court to seize upon indications to raise such an estate, unless such indications, are conclusive of the testator's intent.

The statement in the two items, to the effect that the husband was not to inherit from the children, was made to prevent an inheritance from them, taking as heirs of his daughter, Julia, but

the provision against the husband's taking by reason of Julia's death, from her, conclusively shows that Julia's estate was not limited to a life estate, in the mind of the testator. The statement that if Julia died without children Betty Hunt Selden should take is not sufficient to raise the devise by implication, as expressly adjudged in Tennessee.

The provision that Betty Hunt Selden should take in the event the children died under age and unmarried, was but another condition against inheritance by Julia's husband, and was a condition on which an estate was to vest, and not the giving of an estate.

An implication to be sustained must be unavoidable, necessary and according to Lord Elden, so strong that no contrary intention can be supposed to have existed in the mind of the testator. It is sufficient to defeat it, it seems, if another intention can be imagined. The other intention is offered in this case, as shown by the will itself, which is that the purpose was to cut off the marital rights and curtesy of the husband of Julia, to cut off an inheritance from Julia dying without children, and prevent inheritance from the children before they arrive at an age to dispose of the property themselves, or, in the event they died before they could have children of their own. In other words, it is apparent that the whole scheme of the testator was to bestow his property on his daughter, and prevent the inheritance going out of his own and his wife's family. And it is immaterial whether the will was drawn by a lawyer who correctly carried out the intent, or by the testator who was endeavoring to make it more certain. The intent is still made clear, instead of possible or probable. In view of this intention on the face of this will, it is submitted that to raise the devise by implication is not only to make a will not expressed by the testator, but one he no doubt avoided.

The entire argument of counsel for appellees is based upon the assumption that if the devise by implication is not sustained, it necessarily follows that the testator died intestate, as to a part

of his property, towit, the remainder after the death of Julia Phelan, in the event which did happen, and they are, therefore, arguing against intestacy.    This premise is by no means correct, it is respectfully submitted.

Counsel for appellees reply on two decisions, one of which *Ex-parte Rogers,* they concede is contrary to subsequent decisions in England, where it was rendered.    It is also opposed by the two Tennessee cases, *Nott v. FitzGibbon,* and *Owen v. Hancock,* and the Mississippi case of *Halsey v. Gee,* above cited, and also by *Anderson v. Messenger,* 146 Fed. 929.

A great many of the cases cited for the appellees have been cases where estates were enlarged by implication, as in the Tennessee cases, *supra,* and none of them were cases where an estate was created by implication, under the circumstances of this case.    How it is possible to align the Tennessee courts, which decided against an implication in the children, with *Ex parte Rogers* and *Anderson v. Messenger,* which raised such implication on their particulalr facts, it is impossible for us to see.

There is no elliptical form of expression in this will, no line left out of it and there was no estate to the children, to be enlarged, and the children are nowhere in the will the objects of the testator's bounty; the gift over is not to the heir, but the first taker was the heir, which must differentiate this case from all the cases cited by opposing counsel.


*L. B. McFarland* and *Tim E. Cooper,* for appellees.

The question here for decision is whether, by the will of William R. Hunt, there was by implication a limitation of an estate over to the child or children of Julia A. Phelan after her death. We concede that there is not an expressed limitation of such an estate to the children of Julia A. Phelan; our contention being that the fee was limited over to such children by necessary implication.    We insist that an estate was limited over to the children of Julia A. Phelan.

There are three things apparent from the will.    First: Only

a life estate was given, in any event, to Julia.   Second: There was an exclusion, by the terms of the will, of all the marital rights of any husband that Julia might have and especially an exclusion for him to inherit it through the death of any child or children they may have.   Third: There was a limitation over to Bettie Hunt Selden in event that Julia A. Phelan should die without child or children, or in event such child or children should die, (*a*) before marriage; or (*b*) before becoming of age. It is to be noted just here that by his will, William R. Hunt, made ulterior limitations in either of the above events; first, to Bettie Hunt Selden and if she should die before marriage or becoming of age, a limitation over to Julia Moore Driver of one-half and the other half to be divided between the children of his sisters, Maria L. Joyner and Leona E. Thompson.   Of course, neither of these limitations ever became effective, because Julia A. Phelan left surviving her two children who have reached the age of twenty-one years.   We mention these remote limitations for the purpose of showing the manifest intention of the testator not to die intestate as to any interest in his estate, but to devolve all interest in the estate through a number of remote limitations. It is quite clear that nothing but a life estate was given to his daughter Julia, which was not enlarged into a fee by the limitation over to others if she "should die without child or children, or such child or children should die before marriage or before becoming of age."   Unless, therefore, there was a limitation by implication to the child or children of Julia, then upon the coming of age or marrying of any such child or children, the ulterior limitations to others being cut off thereby, there was a resulting intestacy as to the remainder in fee and Julia took it by descent and not by the will.

   That wills are more liberally construed in this country than in England is pointed out in the case of *Anderson v. Messenger,* 146 Fed. 929.   We ask the court to bear in mind this existing state of the law in England and the United States in considering the cases hereinafter cited, whether in one jurisdiction or the

other.    We concede, of course, that where the words of the testator are such such as to have received a settled and uniform construction there is more difficulty in establishing an estate by implication in opposition to the technical meaning of words, the construction of which is well settled by authority.    The meaning of the word "children," is so firmly and uniformly settled as including legitimates alone that not only will no estate be considered as limited to illegitimates by implication, but they will be held to be excluded by implication even though it be manifest or very probable that the testator intended to make provision for them.    2 Jarman on Wills, §§ 1076–1114; *Abbott v. Essex Co.,* 18 How. 202.

Devises by implication are often defeated by the invocation of technical rules of construction, by the operation of which a manifest understanding of the testator is thwarted under the statement that though estates may be limited by implication, the implication must be a necessary one and that an implication is not a necessary one, when, by looking at the will from a technical standpoint some other possible meaning of the testator can be discovered.

The first rule of construction which we invoke, is that if the will is susceptible of two constructions by one of which the testator disposes of the whole of his estate and by the other a part only, the courts will prefer that construction by which the whole estate is disposed of if this construction is reasonable and consistent with the general scope and provisions of the will. Page on Wills, § 466; Jarman on Wills, § 809, note 29. Where an estate is limited to one and at his death without child or children a limitation to another is made, this alone creates an estate by implication in the children of the first taker.    This was decided in *Ex parte Rogers,* 2 Maddox, 449, to be the rule.    In that case, a testator, by his will had bequeathed £1,000 to his niece.    By a codicil reciting that she had married indiscreetly, and that he intended to withdraw the

legacy out of her power to dispose of it and out the power of her husband to do so, he directed his executors to secure to the said niece the interest of the said £1,000 independently of her husband, by placing out that sum in trust for his niece, she to enjoy the interest or dividends during her life and at her decease without child or children, the principal and interest to be divided between such of her sisters as should then be living. It was held by the vice-chancellor that the children took a legacy by necessary implication. It may be conceded that the authority of this case has been shaken by subsequent decisions in England.

There is a rule of universal application which we invoke, which is that, where there is an estate limited to one and if he dies without children or child, over to another, the courts will explore the whole will and lay hold of slight circumstances to raise a gift to the children. As Mr. Jarman says, by doing so, "avoiding imputing to the testator so extraordinary an intention as that the devisee or legatee over is to become entitled if the first taker have no children, but that the property is not to go to the child, if there be one, or to its parent."

If there is no estate by implication given in the will to the children of Julia A. Phelan, then the fee would pass in different directions as she might, or might not, have children who would reach the age of twenty-one years or marry. If she did not have such children, the estate would go to Bettie Hunt Selden by the first limitation and after her to the children of the two sisters of William R. Hunt. But if Julia had children who should arrive at the age of twenty-one years or marry, then unless they take an estate by implication the fee would fall into the residuum of the testator's estate and pass to Julia in fee by descent, or by implied devise. Now precisely this test has been held to be sufficient to raise an estate by implication in England. *Cropton v. Davies,* 4 L. R. Common Pleas Cases, 159; and see also *Kinsella v. Caffrey,* 11 Irish Ch. 154; 1 Jarman on Wills, 557; Theobold on Wills, 738; *In re Rawlings' Trust,* L. R. 45 Chan.

Div. 299; *Tompkins v. Tompkins,* 1 Burr. 234; *Gardner v. Stevens,* 30 L. J. Chancery, 199; *Wilkes v. Williams,* 2 J. and H. 125.

In *Goodright v. Hoskins,* 9 East, 306, the testator gave an estate to his son Richard until the latter's eldest son Thomas should attain twenty-one years, and no longer. If Thomas should die in his minority, the estate was to go to his younger brothers John and Richard, or either of them who should attain majority; and the testator added, "and I desire the said premises may be quitted and delivered as aforesaid by my said son Richard Hoskins accordingly." It was held that Thomas upon arriving at majority, took the fee by implication.

In *Thorpe v. Owen,* 2 Hair, the testator directed that "everything should remain as it now is," during the life of his wife and this was held to give the wife a life estate by implication.

In *Sweating v. Prideaux,* 2 Chan. Div. 413, the testator devised £16,000 in trust to invest the same and pay the income from £8,000 a part thereof, to his daughter, Anne, for her life on her separate receipt and after her death to divide the £8,000 among her children at twenty-one years of age; and directed his testators to pay the income from the remaining £8,000 to his daughter, Sarah, for life in the same manner in every respect and subject to the same control as directed to his daughter Anne; it being his intention that the said daughters' fortunes should not be subject to the control or debts of their husbands. The will made no provision as to any division of the capital among the children of Sarah. The testator gave to the same trustees a sum of £6,000 to invest and pay the income to his son for life and to divide the principal among the son's children, and gave the trustees power to apply the income of both funds for the maintenance and education of the daughters' and son's children. It was held that upon the death of Sarah, her children were entitled by implication to the sum of £8,000.

It is well settled in numerous cases that a devise or bequest

to a widow for life if she shall not marry, and if she shall marry, then over to another person, gives the remainder after death of the widow to such person by implication even if she does not marry. *Re Vowers*, 113 N. Y. 569; *Grout v. Hopgood*, 13 Pick. 164; *Marks v. Hague*, 1 Ed. Chanc. 174; *Abbott v. Middleton*, 21 Beavan, 143; *Aspey v. Lewis*, 152 Ind. 494; *Boston Safe Deposit Company v. Coffin* (Mass.), 8 L. R. A. 740; *Metcalf v. Parish of Framingham*, 128 Mass. 375; *Luxford v. Cheeke*, 3 Lev. 125.

In the will of William R. Hunt, there is a manifest expression of his opinion that he had given some estate to the children of Julia. The estate given to Julia was expressly limited to a life estate. He did not intend to give her more than that. The case is, therefore, free from any suggestion that Julia was to have the fee on condition that she died leaving children whether the children should or should not reach the age of twenty-one years or marry. It is apparent that the testator thought that, by by the terms of his will, the children of Julia would take some estate, for he not only excludes from the control of any future husband of Julia the estate which he gives to her, but expressly provides that such husband is not to inherit through the death of any child or children they may have or in any other manner whatever.

There are other circumstances than those we have referred to, upon which the court will lay hold to create by implication the estate in favor of such children. We have only referred to the classes of circumstances which we think bear on the phases of this will, and it is sufficient for us to recapitulate our propositions, which are:

First—That where, as here, the will of the testator shows a purpose to dispose of his whole estate, such construction will be adopted, if possible, as to prevent intestacy in reference to any part of it; and we submit that the will in this case shows a purpose of the testator to dispose of his whole estate and that

he has given to his daughter, Julia, what estate he intended for her to have and did not intend for her to take anything by his partial intestacy.

Second—That where the limitation is over to a third person not related to the testator in blood the court will so construe the will as to preserve the bounty of the testator to his own descendants, if the language of the will permits such construction. And we show here that the children of Julia were intended to take, or the estate was given over to strangers of the blood.

Third—Unless the children of Julia take an estate, then the fee will pass in different directions as such children may or may not reach the age of twenty-one years or marry. This has been held a sufficient circumstance alone to raise a devise by implication.

Fourth—Where the limitation over to the third person is not only upon the default of children, but that such child shall die under twenty-one years of age. This circumstance is sufficient to raise an estate by implication, as expressly decided in *Kinsella v. Caffrey, supra,* which case was approved by the English court in L. R. 45 Chan. Div. 299.

Fifth—Where, from a reading of the whole will, it is apparent that the testator thought he had given an estate to the children. *Marsh v. Hague,* 1 Ed. 174; *In Re Vowers,* 113 N. Y. 569; *Abbott v. Middleton, supra; Aspey v. Lewis, supra; Metcalf v. Parish of Framingham, supra.*

It is said by counsel for appellant that the decisions of the supreme court of Tennessee in the cases of *Owens v. Hancock,* 1 Head, 564, and *Nott v. Fitzgibbon,* 107 Tenn. 54, are decisive of this case. But inasmuch as we look to the law of the domicile for the purpose only of finding the intention of the testator, and as his intention is supposed to be disclosed by the decisions of the courts of his state, and since only those decisions which had been rendered by the supreme court of Tennessee before his death could possibly have been known to him, the case of *Nott v. Fitzgibbon* would not throw any light upon the

subject. But without stopping to contend against the effort of that decision, we take up the Tennessee cases as a whole and proceed with the investigation.

In *Owens v. Hancock,* supra, this rule and this only seems to be announced, viz.: That where an estate generally or for life is given to one, and if he dies without "issue" or "without heirs of his body," there is a limitation to a third person, the courts will, by implication,—that is, for the purpose of carrying out the apparent but not expressed will of the testator— convert the estate of the first taker into a fee tail, which, in its turn is, by the statute of Tennessee, converted into a fee-simple. The result reached is a curious one when we look to the reasoning by which the courts were originally controlled. As is stated in 2 Brown's Chancery, the reason is that the courts presumed that the testator intended that the first taker should hold the estate both for himself and for his issue, and so, in order that this may be done, the estate is converted into a fee tail. It would seem that when the statute forbids fees tail and converts them into fees simple, the reasoning from which the implied devise is raised would fail. For certainly, where the first taker takes the fee simple, he does not thereafter hold anything *per formamdoni* for his issue.

The contention of opposing counsel that a devise for life to A, and, if A dies without issue, over to B, will give by implication the fee to A, includes, of course, the concesison that Mr. Hunt never intended for the fee to pass by his intestacy as to it. So the question is, whether since the court must imply a devise of the fee, it will imply a devise to Julia, or to such of her children as reached "the age of twenty-one years or marry." We think that upon reading the will the court will readily see that it was not drawn by a lawyer. If, as opposing counsel insist, the testator drew this will in the light of the Tennessee decisions, then he must have known that when he gave a life estate to Julia, and provided that it should go over to Bettie Hunt Selden upon the death of Julia without issue, that if Julia die

without issue, the estate would belong to her by an implied devise in fee tail, which the statute converted into a fee simple. If this was the purpose of the testator he would have stopped just there, especially if he had been the accurate and learned lawyer which opposing counsel insist that he was. The decisions of the supreme court of Tennessee align that court directly with the court which decided the case of *Ex Parte Rogers, supra,* and the Circuit Court of Appeals which decided the case of *Anderson v. Messenger,* to the effect that a simple devise to one, either generally or for life with a limitation over if such one die without issue, gives rise to an implied devise and that the testator does not under such circumstances die intestate as to the fee in the property thus named.

The rule in *Shelley's case* was abolished at an early day in Tennessee and so the court, in the cases cited by opposing counsel fell back upon an implied devise. But in neither of these cases has the supreme court of Tennessee laid down a rule which is at all controlling of the devise in the case now before the court.

In *Owens v. Hancock, supra,* the limitation was "to Mary Cooper during her life and if she should die without heirs of her body," etc. In *Nott v. Fitzgibbon, supra,* the devise was to James Fitzgibbons for life, "and if he should die without issue, over," etc. In both of these cases words are used from which an estate tail can be inferred, for if the gift is to one and the heirs of his body or issue, they are typical of estates tail. And so, we say of the decision in Tennessee that they may all be reduced to this rule: that where an estate is given to one for life, and upon his death without issue or without heirs of his body, the estate is limited over to a third person, the court will imply a further devise, to wit: a devise in fee tail, which the statute law of Tennessee should convert into a fee simple. How these decisions can be invoked as creating an estate in fee in Julia under the will of Mr. Hunt, we confess our inability to see. They do decide that where an estate for life is given

to the first donee and there is a limitation over if the life tenant should die without issue or heirs of his body (words of indefinite failure of issue at common law), the court, by implication, will convert the estate into a fee tail. The court in these cases, relying upon the common-law decisions where death "without issue or without heirs of the body," meant an indefinite failure of issue, applied the same rule, although under the statute of Tennessee, the words "dying without issue," mean a definite failure of issue, to wit: A failure of issue at the death of the testator. It is apparent that these decisions can have no influence in determining that the implied devise will be to the life tenant rather than to his children, where the limitation over is upon the death of the life tenant, "without children or if the children die unmarried and before the age of twenty-one years.

It is, of course, useless for us to say that the words "child or children dying before mariage or twenty-one," are words of purchase and not limitation. It is true that in *Jordan v. Roach,* 32 Miss. 481, it was held upon the whole context of the will in which the testator had used "issue" and "children" interchangeably, the word "children" was synonymous with "issue;" but it was the peculiar provision of that particular will that led to that construction. The words "children who shall reach the age of twenty-one or marry," are so clearly words of purchase and not of limitation, that we decline to involve ourselves in any consideration of the rule in *Shelley's case*: *Cannon v. Barry,* 59 Miss. 289 ; *Tate v. Townsend,* 61 Miss. 316.

Counsel for the appellant seek to evade the strength of the contention that the testator, Mr. Hunt, thought that he had given an estate to the children of Julia, as evidenced by the provision that their father should, in no event, take inheritance from them. Counsel say that what this learned lawyer meant by this item of his will was, that the father of the children of Julia should not take by descent any estate which these children might take by descent from Julia. The fallacy

of this reply is obvious. What the testator was attempting to do by this clause of the will, was to impose limitations upon estates which he was giving by the will and not limitations upon estates which he did not intend to give by the will and which might be taken by descent. This would be a complete reply, as we submit, if the court should be of opinion that the will was drawn by a skilled lawyer. But, as a matter of fact, it is perfectly clear on the face of the will that it was not drawn by a lawyer.

The suggestions made by counsel as to what was running in the mind of Mr. Hunt, are, it seems to us, fanciful. They are the product of a subtle and trained legal mind, invented to escape a palpable but blunderingly expressed purpose of the testator.

In conclusion, we contend: First—That the will shows that the testator did not intend to die intestate as to any part of his estate.

Second—That where the limitation is over to a third person not related to the testator in blood, the court will so construe the will as to preserve the bounty of the testator to his own descendants.

Third—That unless the children take an estate, then the fee will pass in different directions as such children "may or may not reach the age of twenty-one years or marry."

Fourth—Where the limitation over is to a third person upon default of children of the first taker who shall die under twenty-one years of age, a devise to such child will be implied.

Fifth—Where from a reading of the whole will, it is apparent that the testator though he had given an estate to the children, a devise by implication will result in the children's favor.

In this case, we have a combination of circumstances appearing on the face of the will which, taken singly, will raise an implied devise. Taken together, they are not slight, but very strong circumstances, which the court will "lay hold of," in

the language of the text-writers, to imply a devise in favor of the children of Julia Hunt who have arrived at the age of majority.

In addition to this, under the authorities in the state of Tennessee, a devise will be implied from a mere gift to one with a limitation over if he dies without children. If the limitation over is upon the death of the first taker "without heirs of the body or issue," the implied devise will be of a fee tail to the first taker in order that he may hold for the issue, as well as himself.

But where, as here, the limitation over is upon the death of the children without coming of age or marriage, it is submitted to the court that, while following the decisions of Tennessee some devise will be implied, the implication will be of a devise to the children "who shall reach the age of twenty-one years or marry," and not of a fee to the first taker. *Clopton v. Davis,* 4 L. R. C. P. 159; *Jordan v. Fortescue,* 10 Deav. 259; *Harper v. Tootal,* 11 House Lords Cases, 143; *Reed v. Snell,* 2 Atkins, 346; *Ferrand v. Jones,* 37 N. C. 236; *Re Blake,* 36 L. J. C. H. 747.

WHITFIELD, C. J., delivered the opinion of the court.

The bill of complaint in this cause was exhibited by the appellees herein against William M. Ball for the purpose of canceling, as a cloud upon their title, certain conveyances under which Ball claims to be the owner of lands described in the bill. The bill avers that the appellees are the grandchildren of one Wm. R. Hunt, who died the owner of the lands situated in Mississippi described in the bill, testate. That the said Wm. R. Hunt was a resident of the state of Tennessee, and his will was duly admitted to probate in the probate court of Shelby county, Tenn., and afterwards by the chancery court of Tunica county, Miss., some thirty-six years later. That the will was a holographic will. That the said testator left as his widow Sarah Hunt, and as his only heir at law Julia A. Phelan. That the

appellees are the children of Julia A. Phelan, who died on the 13th day of February, 1906. That they are the only children of the said Julia A. Phelan, and the only lineal descendants of Wm. R. Hunt. That after the death of said Wm. R. Hunt the defendant Ball, or those under whom he claims, bought from the said Sarah Hunt and Julia A. Phelan the land described and claims the same adversely to complainants. The bill sets out *in hæc verba* the will of Wm. R. Hunt, under which the appellees claim that an ulterior limitation to them in fee after the death of their grandmother and mother was devised by implication. The defendant demurred to the bill. All the grounds of the demurrer present practically the same question, which is that complainants have no title or interest in the land under the will of Wm. R. Hunt. The demurrer was overruled and an appeal granted by the chancellor.

The whole case made by the bill, and the whole defense relied upon by the defendant, is presented by the demurrer. If that is sustained, complainants have no standing in the court. If it is overruled, the relief prayed by the bill follows as a matter of course, and nothing is left except an accounting.

The will of Wm. R. Hunt is as follows:

"In the name of God, Amen.

"I, William R. Hunt, being of sound mind, but feeble of body, do make and declare this my last will and testament hereby revoking all wills and testaments heretofore made.

"Item 1st: I will unto my wife, Sarah E. Hunt, for the time of her natural life, one-half of my property, both real and personal, to be hers during her natural life, then to go to my daughter, Julia Hunt.

"Item 2nd: I will and bequeath to my daughter, Julia Hunt, during the time of her natural life, the other half of my property, both real and personal, to be hers, free from the control of any future husband, and also free from the debts of any future husband, he is to have no title by curtesy, or any other title by reason of her death, or is to inherit it through the death

of any child or children they may have or in any other manner whatever.

"Item 3rd: In case my daughter Julia should die without child, or in case the child or children should die before marrying or become of age, then the whole property given to my daughter Julia, all for her life, should go to Bettie Hunt Selden, and should she die before she marries or becomes of age, then one-half should be the property of Julia Moore Driver, and other one-half shall be divided between the children of my sisters, Marie L. Joiner and my sister, Leona E. Thompson, and the said Julia Moore Driver shall receive the property only for her natural life, free from the debts and contracts of any present or future husband and should at her death follow the same line of descent as the first mentioned half of the property.

"Item 4th: It is my will that the whole of my insurance on my life, amounting to $40,000, be put into the hands of my executor to pay my debts with, and he is directed so to use it, and if there be a surplus pay it into the general mass of my estate.

"Item 5th: I appoint Wm. Joiner my executor of this my last will and testament, and desire that no security be required of him.

"For witness whereof, I have hereunto set my hand and seal this 26th day of January, A. D. 1872.

"[Signed]                         WM. R. HUNT.

"Signed by us in the presence and by the direction of the testator, January 26th, 1872.

"[Signed]                         J. W. CLAPP.

"J. P. MEUX.

"There is to be paid all mother's money except $7,000, my share of her property, which is to be kept as mine.

"Proven at the June term, 1872, of the probate court, and ordered to be recorded.

"Recorded June 26th, 1872.

"JAMES RULBY, Clerk.

"J. H. CULLEN, D. C.

It will thus be seen that the exact question presented for decision upon the consideration of this will, especially the third clause of said will, *supra,* is this: Is there an implied limitation of a remainder in fee to the children of Julia Phelan after her death by said will? There is, of course, no express limitation, and these complainants, if they take at all by purchase, must take by virtue of such implied limitation. The one fundamental rule governing the construction of all wills is to ascertain what the intent of the testator was. This intent must be gathered, it is true, from the language used in the will, and by this is meant that such intention shall be gathered from the four corners of the instrument; that, is to say, from the whole will—the whole frame of the will; the whole scheme of the testator manifested by the will, taking into consideration and giving due weight to every word in the will; and, when once the actual intent of the testator at the time of the making of the will has been in this way ascertained, all minor, subordinate, and technical rules of construction must yield to this paramount intent thus ascertained. · As well said in *Re Donges' Estate,* 103 Wis. 497, 79 N. W. 787, 74 Am. St. Rep. 885: "The comprehensive and all-dominating rule in construing wills is that the intention of the testator must be ascertained from the words thereof, in the light of all surrounding circumstances, and that intention be given effect. To accomplish this, multitudinous minor rules have been announced, more or less technical, which, however, serve not so much to restrict or constrain the judicial mind as simply to guide and to indicate probabilities in the absence of countervailing consideration. None of them are to be followed blindly if they lead to subversion of what was clearly the intention of the testator." It is also, of course, true that there must be no implication where that implication violates public policy or the settled rules of positive law. Extreme language is sometimes used by the courts as to how strong this implication must be. We think about the best statement on this point we have found is that of Judge Finch in the *Matter of Vowers,* 113 N. Y. 569, 21 N. E. 690, where

he says: "The rule of construction which seems to have prevailed is that the inference need not be irresistable or such as to exclude any doubts possible to be raised, but must, nevertheless, be such as to leave no hesitation in the mind of the court, and must rest not upon mere conjecture. The intention must be clear so that no other reasonable inference can be made." Another question we make on this point because of the strong, common-sense grip it manifests upon this precise point, and that is what was said by STRONG, J., in *Still v. Spear,* 3 Grant's Cas. (Sup. Ct. Penn) 306, in a case not cited by counsel on either side, where he said: "The contruction given by the court below to the will of Charles Still, Sr., plainly defeats the general intention of the testator, and this without any necessity, for those intentions are not in conflict with any rule of law, or with any policy which the law does not tolerate. There are certain principles, it is admitted, which are intended to assist in ascertaining a testator's intention, and which are controlling when that intention is doubtful. They have been invoked to sustain this judgment. Among them are the maxims that the first taker of a legacy is presumed to be the chief object of a testator's bounty; that in doubtful cases legacies are to be held vested rather than contingent, absolute rather than defeasible; that the law favors such a construction as will render estates alienable; and that the primary intent is to be regarded rather than the secondary, if both cannot prevail. But these principles shed no light upon the will now before us. They are only applicable in cases of doubtful construction. They are never allowed to defeat a plain intent expressed. The purpose of the testator in this will is not obscure. That he did not intend Levi Still to have any share of his estate absolutely, that he did not intend to expose any part of it to seizure at the suit of Levi's creditors, and that he did intend a benefit to the children of Charles Still, on the happening of an anticipated contingency, would be very plain to every common mind. It is only when refinement commences that doubts arise."

Lord St. Leonards said very strongly in the profoundly con-

sidered case of *Abbott v. Middleton,* 7 House of Lords Reports, side page 67 : "I deny that you are not at liberty to look at the whole frame of the will in order to collect the general intention." And in the same case he says again, speaking of a construction in the case of *King v. Mellen:* "Now look at that; Lord Hale tells you that he could not be thought to prefer the youngest son before issue of the eldest;" and, in his most masterly exposition in that cae, he finally says : "I endeavor, and always have endeavored, to keep within these rules; but while I have endeavored to keep within those rules, I have also endeavored, where I could, to make them bend so as probably to meet the justice of the case."

Van Vleet, Vive Chancellor, put it very well in *Bishop v. McClelland's Ex'rs,* 44 N. J. Eq. 450, 16 Atl. 2, 3, 1 L. R. A. 551, where he said : "A bequest may undoubtedly arise from implication, but, to warrant the court in so declaring, there must be something more than conjecture to support its declaration. The implication must be a necessary one. The probability of an intention to make the gift must appear to be so strong that an intention contrary to that which is imputed to the testator cannot be supposed to have existed in his mind. A construction in favor of a gift by implication should never be adopted, except in cases where, after a careful and full consideration of the whole will, the mind of the judge is convinced that the testator intended to make the gift."

Let us now, in the light of these general principles, come to a particular consideration of the authorities relied upon on both sides, and, first, as to the authoritites which support the contention that there is here a remainder in fee to Julia's children by implication. In *Frogmorton v. Holliday,* 3 Burrows, 618, the testator, after giving, devising, and bequeathing unto his son David Hasselwood or his heirs forever certain property, devised to his other son, John Hasselwood, a certain piece of real estate, and added : "And if the said John Hasselwood shall happen to die his minority or before he comes to age, then I de-

vise the said property unto my three daughters equally share and share alike." John was of the age of seven years at the time of the making of this will. John entered upon and was seised of the property until the time of his death, which happened in 1762. In the lifetime of John, David died intestate, leaving issue, to wit, David, his eldest son, who by deed of bargain and sale, conveyed the premises away to Stephen Bramstone. It was held that John did not take a mere estate for life, but the limitation over, only upon the contingency of his dying in his minority, shows that it was intended to give him an absolute estate in fee which he might dispose of if he came of age, and that unless he lived to be of age, when he might dispose of it, it was meant that it should go over to the daughters named in the will, and the conclusion was that John should have the estate unless he died in his minority, although there were no words about John's leaving issue.

In *Newland v. Shepherd*, 2 Peere Williams Reports, p. 193, Sir George Newland, whose daughter had married Shepherd and had three children, after making some other dispositions, "devised the residue of his real and personal estate to trustees to pay the produce and interest thereof for the maintenance and benefit of such of his grandchildren by his said daughter as should be living at the time of his decease until his said grandchildren should come to the age of twenty-one or be married; and he went no further nor made any other disposition of his estate." It was held that the grandchildren on arriving at age were entitled to the entire surplus, both of the real and personal estate.

In *Goodlittle v. Whitby*, 1 Burrows, 228, R. P., one devised his property to trustees in the following language: "In trust that they should lay out and bestow rents and profits for the maintenance, etc., of Thomas and John Haywood, sons of the testator's sister, Elizabeth Haywod, during their minorities; and when and as they should respectively attain their ages of twenty-one, then to the use and behoof of the said sons of his

sister Haywood and their heirs equally." Thomas Haywood, the eldest of the testator's two nephews, died under the age of twenty-one without issue. Upon his death, his brother John being then under age, Thomas Whitby, the testator's heir at law, was let into the moiety of the deceased's nephew Thomas Hey-wood by the trustees. John, the surviving brother, brings the ejectment, and claimed the moiety of his deceased brother, as well as his own proper moiety, and the question was whether this moiety of Thomas, the deceased brother, belonged to John Haywood, either as heir to his brother or as surviving joint tenant, or whether it belonged to Thomas Whitby as his heir at law as an undevised estate; and Lord Mansfield held as follows: "Here, upon the reasoning of the thing, the infant is the object of the testator's bounty; and the testator does not mean to deprive him of it in any event. Now, suppose that this subject of the testator's bounty marries and dies before his age of twenty-one, having children. Could the testator intend in such an event to disinherit him? Certainly he could not." And let it be borne in mind that Julia Phelan, in this case, had children who came of age and married. Lord Mansfield said in the case *supra* that it was "so plain that it was a shame to cite cases upon it," but he did cite a devise, *Tomkins v. Tomkins,* where the devise was to his brother in trust for his eldest son B. until he should attain twenty-one years, and if he should die before twenty-one then a devise over, in which case the court held the age of twenty-one to be no limitation of B.'s interest, but only a limitation of the trust during his minority, and that B. took the whole by implication; and Lord Mansfield added, "So, here, the property is absolutely given, and the limitation is one of a trust."

In the case of *Crowder v. Clowes,* 2 Vesey, Ch. Reports, 449, the testator devised to his niece, Letitia Dawson, the sum of £1,000, to be paid to her immediately after his decease if she should happen to be then married; and then added: "But if my said niece should happen not to be married at the time of my

decease, then I direct the interest for her said legacy of one thousand pounds to be paid her during her natural life, and to be calculated and be paid to the day of her death, or till she should marry, and if she should die unmarried, then the principal of the legacy was to lapse for the benefit of the person who might be entitled to his real estate." The legatee was unmarried at the time of the testator's death, but married soon afterwards. The bill was filed by her with her husband claiming this legacy, and the Master of the Rolls said: "There is no doubt that is there are not express words or necessary, and I will say unavoidable, implication from his having given it over if she dies unmarried, I cannot supply it. I cannot dive into his intentions, unless it is so expressed as to satisfy me he did mean it. The only question is whether upon reading this legacy and coupling it with a codicil giving two hundred pounds more to Letetia which may have effect upon the word 'addition,' it is not clear he meant to give her this when she married. Is it not the same as to say that is shall not lapse if she does marry? I am clearly of opinion it must be raised." And so Letitia took the legacy when she married, though she married after the testator's death.

In *Wainewright v. Wainewright,* 3 Vesey, 558, the devise was in these words, after giving to his four nephews and his niece each the sum of £300: "All the rest of my personal estate not hereinbefore disposed, I give unto my said nephew Robert Wainewright and John Seagrave upon trust that they should convert the property into money and lay it out toward the maintenance of his great nephew Thomas Wainewright now placed with my nephew Robert Seagrave, in Nottingham, until he shall attain his twenty-one years;" and added, "and in case my said great nephew shall happen to die before he attains his age twenty-one years, then my trustees shall pay the whole of said surplus of my personal estate, etc., unto and for the benefit of my said nephew, Thomas Wainewright." The testator died soon after the execution of this will. His great nephew, Thomas

Wainewright, having attained the age of twenty-one, filed a bill praying that he might be declared entitled to the residue of the testator's personal estate, and the Master of the Rolls held that there was a necessary implication that, if the plaintiff Thomas did live and attain the age of twenty-one, he should have the residue of the personal estate, and significantly said: "Can any one doubt about it? His death under the age of twenty-one is to give it over to his father; but if he lives to attain that age, then the testator dies intestate—that is impossible. Is it not the necessary inference exactly like that in the case I have cited?"—to wit, the case of *Crowder v. Cloud, supra.*

In *Paylor v. Pegg,* 24 Beavan, 105, the will was construed as follows: "And if my son should happen to die before he attains his age of twenty-one years, then in that case I do hereby empower my wife to hold my whole estate during her natural life. If she continues my widow. Likewise, I do hereby empower my trustee, at the decease of my wife, to sell my estate, both real and personal, and out of the money I direct them to pay two legacies, etc., the residue to go amongst my nephews and nieces." The testator died in 1809. His son John attained twenty-one in 1823, and was let into possession. The testator's widow died in 1841, and the testator's son John died in 1856, having devised the estate to Mrs. Pegg. It is true this was not a case of implication, but I cite it to show that the court in holding that the son took the estates upon death of his father, by descent, worked that result out by finding it to be the purpose of the father not to disinherit his son, the court saying: "It is impossible to understand why the testator should have given the property to his son until he was twenty-one and then took it all away from him and gave it to his nephews."

A striking case is *Hoskins v. Hoskins,* 9 East, 305. There the devise was: "I likewise give and bequeath to my said son Richard the leasehold premises of Roskief, in St. Allen aforesaid; to hold the same unto my said son Richard until said son Thomas shall attain his age of twenty-one years and no longer.

In case said Thomas Hoskins shall die in minority, then my will is, and I do hereby give and bequeath the said leasehold premises of Roskief unto John or Richard as soon as the said Richard Hoskins or either of them surviving or attain their age of twenty-one years as aforesaid, and I desire the said premises of Roskief may be quitted and delivered up as aforesaid by my said son Richard Hoskins accordingly." It was held that there was an implication from the words of the will that Thomas should take Roskief in fee when he came of age. Emphasis was laid, it is true, upon the last clause quoted, but the construction was upon the whole frame and scheme of the will.

In *Re Donges' Estate,* 103 Wis. 497, 79 N. W. 787, 74 Am. St. Rep. 885, the devise was: "I give and bequeath to my wife Clara Donges all the real estate of which I may die seised, to have and to hold the same until the youngest of my children if any be born to me, shall attain the age of twenty-one years. In case there are no children living at the time of my decease, my said wife shall be the sole owner of my real estate." The question was what was the intention of the testator if children were born to him and living at the time of his decease after the youngest attained twenty-one years of age. After an elaborate examination of authorities, in the course of a very able opinion, it was held that it was clearly the testator's intention to devise the property to the children on the majority of the youngest, they taking by implication.

Another instance of devise by implication may be profitably studied in the case of *Masterson v. Towshend,* 123 N. Y. 458, 25 N. E. 928, 10 L. R. A. 816. The case of *Clopton v. Davies,* 4 L. R. Com. Pl. Cas. 159, is very much in point here. There was a devise to trustees to apply the rents to the benefit of the testator's granddaughter, Mary Annie Clark, until she attained the age of twenty-one, and if she should die under that age, then over. It was held that there was a devise of the fee by implication to his granddaughter, Mary Annie Clark, the court saying that to deny the implication would involve the strange conse-

quence "that, if the granddaughter die after twenty-one, the estate would go over to the two daughters named, whereas, if the granddaughter attained twenty-one, it would go over to the residuary legatees, who were other persons. The intention, the court said, was not to be imputed to the testator."

One of the strongest cases for the complainant is that of *Kinsella v. Caffrey*. There the testator gave £50 a year each to L. and T. for their lives, and on the death of either, leaving children, his annuity to go to such children, but if L. or T. should die leaving no children, at his death, his annuity was to go to the survivor for his life, and, if both should die leaving no children, or, leaving children, the said children should die under twenty-one, both annuities were to sink into residue. T. died unmarried, and afterward L. died, leaving children. It was held that L.'s chilren were entitled by implication to T.'s annuity, the court asking, "Why was the event of their attaining twenty-one introduced if they were intended to take nothing prior to their attaining twenty-one?" This case squarely decides that where the limitation over to the third person is not only upon the default of children, but upon the event that such child shall die under twenty-one years of age, this last circumstance is sufficient to raise an estate by implication. The decision did not go—that is to say, the devise was not implied—upon the ground that it increased an estate already given, but because the limitation over was upon the death of a child before coming of age. Mr. Jarmon propounds in his valuable work, Jarmon on Wills, vol. 1, p. 557, the inquiry, "Why was the event of their attaining twenty-one introduced if they were entitled to take nothing prior to their attaining twenty-one?" causing the same to be printed in italics, for the express purpose of showing that this thought was a controlling one.

In *Aspey v. Lewis*, 152 Ind. 494, 52 N. E. 758, an estate in remainder by implication was held to have been given to the daughter, Maria Louisa, under this provision: "And I direct

further that the estate (that is to say, a widowhood estate in his wife Elizabeth) that is bequeathed to my wife shall be in full possession of my only daughter Maria Louisa at the death or marriage of my wife, provided she be living, and if she is not living at the death or marriage of my wife, then the estate to go to the use of my brothers or sisters or their heirs." The controlling thought was that no construction of a will should be accepted unless the purpose was manifest, if that purpose resulted in the disinheritance of a child, and the construction was had so as to vest this remainder in fee by implication in Maria Louisa as carrying out the intent of the testator, althought there was an express provision in the will that if Maria Louisa was not living at the death of the widow the estate should go over to the brothers and sisters.

A very important case in considering the construction of this will, not referred to by counsel on either side, is the case of *Bentley v. Kaufman,* 12 Phil. (Pa.), 435. The testatrix directed all her estate, real and personal, to be sold and the proceeds to be invested by her executors in the best securities, the interest to be paid to her son during his nautral life. If her son should die without issue, then the whole investment to be given to the Lincoln Institute. It was held first that the words "die without issue" meant a definite failure of issue, and that, consequently, the son did not take an absolute interest in the fund, but only life interest in the income; and, secondly, that there was a gift by implication of the corpus of the legacy to the son's issue if he should leave any at his death. THAYER, J., made the following exceedingly strong observations on this case: "The real question, therefore, which is now to be determined is, what interest did Leon Kaufman take under his mother's will? Did he take an absolute estate, or only a life estate? And, as regards the answer to this question, no difference is to be made between that portion of Mrs. Kaufman's estate which was of her own acquisition and that portion which she derived from her father by her survivorship of her sister Sarah and her

brother Joseph, for over both portions alike she had an absolute right of control and disposition, and both alike passed under her will. Now, it must be quite plain to the common understanding that Mrs. Kaufman did not intend to give her son an absolute estate in her property, but only the interest of the proceeds, when invested, during his natural life. In the first place, she said so explicitly in her will. The gift to her son is a gift 'of the interest of my estate,' and it is 'to be paid to my son during his natural life, in half-yearly payments, and she gives him nothing more. In the second place, she directs that if her son, Leon Kaufman, should die without issue, that the whole of her estate should go to the Lincoln Institute. What is this but a gift of the interest to the son for life, with a remainder (if one may, for convenience, speak of a remainder with reference to personalty), by necessary implication, to his children, and, in default of children, a gift over to the objects of her charitable bounty? But, although this may be ever so plain to the common understanding, it is asserted by the plaintiff's counsel that the intention is defeated by the application of the rule that when there is a gift of personalty for life, followed by a gift over in default of issue, there being no immediate gift to the issue, the gift over is void, and the first taker takes absolutely—a proposition entirely correct in its terms where there is no intermediate gift to the issue, either expressly or by implication, and where the gift over is dependent upon an indefinite failure of issue. But it has no implication whatever in a case where the limitation over is on failure of children only, or on failure of issue within a given time, or where there is an intermediate gift by necessary implication to the issue of the first taker."

In the case of *Ranelagh v. Ranelagh,* 12 Beavan, 200, the devise construed there was this: After giving to his two daughters during their natural lives £4,000, and to his two sons £2,000 each, during their natural lives: "In case of the decease of any of the above parties without issue, their, his or her proportion to be divided equally amongst the surviving heirs." It

was held that dying without issue meant living at the date of the death of the legatee—definite failure of issue. It was held further that the issue of the legatee were named in the codicil, only as a description of the contingency on which the legacy was to be given over, and that no express interest was given to the children. The Master of the Rolls went so far as to say that he thought it extremely probable that the testator did mean a benefit to the children, but *"si voluit non dixit,"* and he denied the implication. He referred expressly to the distinction that might exist between the case where the first devisee took for life only and where he took the fee, as to which later.

Another strong case against implication is the case of *Den, Lessee of Elizabeth Franklin v. Trout,* 15 East's Reports, decided in 1812 by Lord ELLENBOROUGH. Still another very striking case against implication is the case of *Dowling v. Dowling,* 1 Eq. E. L. R. 441. The case was first decided by Sir John STEWART, V. C., who held that there was an implied devise, but afterwards it was reversed. See 1 Chancery Appeal Cases, L. R., decided in 1866, *Dowling v. Dowling,* and the devise by implication was denied. In this case the testator, R. II. Dowling, after various devises to his daughter, and to his daughter's husband, and his two sons-in-law, finally added this devise: "I bequeath to each of my sons as follows (four in number), the remainder of my household furniture, and all things appertaining to my household effects, to be equally divided, that my freehold estates and all other property shall be disposed of as my executors think best, and be added to and invested with any other personal property, the interest thereof to be equally divided half yearly between my four sons above named, and at the decease of either without lawful issue, such share to revert to the remainder then living, their child or children." Lord Justice TURNER, construing this last provision, said: "The gift to the sons was an unlimited gift of the interest passing the capital. The expression is, 'the interest to be divided half yearly between my four sons, and at the decease of either without leav-

ing issue, such share to revert to the remainder,' which seems to assume that the share of each was considered by the testator to have become vested in the original persons to whom he had given it.    There is, therefore, in my opinion an absolute gift to the sons but this absolute gift is subject to this condition: that, upon the death of either of them without issue, the share is to revert to the remainder then living or their child or children.    It appears to me, upon the construction of the whole will, that the children are not to take any interest as against their parents. If the parents are out of the way, then the children are to take in their place, but so long as there are parents the children are to take nothing, and the testator thought that in that case he had done enough for them, for the parents might provide for their own children.    This case is exactly on all fours, in principle, with the case of *Halsey v. Gee,* 79 Miss. 193, 30 South. 604. That case went upon the ground that the two devisees there took the absolute interest, not a life estate, an absolute interest, determinable, it is true, upon the contingency named, but nevertheless an absolute interest as distinguished from a life estate.

In the case of *Scale v. Rawlins,* reported in the Law Reports, Appealed Cases for 1892, the provision was that the testator gave three freehold houses to his nephews, S. and W., upon trust to pay the rents and interest to his niece during her life, for her separate use, and after her death, she leaving no child, he gave one of the houses to S. and the two others to W.    After making other bequests, he gave the residue of his whole estate to S. and W. equally.    The niece died leaving children, and it was held that the niece took a life interest only, and no estate by implication was allowed to her children.    Lord HALSBURY said: "The difficulty which we have here is not speculating upon what peradventure may, at some time or other, have been in the testator's mind, but I must find words which are absolute and express.    I may be perfectly satisfied that he intended that this lady should have an estate of inheritance in this property.    I may be satisfied that that was his intention otherwise than by

the words of the will, but I should be compelled to come to the same conclusion as I do now, viz., that that intention is not suffi-ciently expressed. . . . It is said that he intended to make a gift to the children. I cannot say that he had not the intention, but all I can say is that he has not expressed it, and your lordships cannot put it in words simply because you may have some suspicion that in making his testamentary disposi-tion that was the intention on his mind." This is, perhaps, as strong a statement as can be found against devise by implica-tion, unless perhaps—and we close quotation on this topic with the language in the case—it is the language of Sir H. Cotten, referred to in 2 Jarmon on Wills, where Mr. Jarmon says: "Sir H. Cotten pointed out the fallacy of a proposition urged at the bar in this case, and which sometimes of late had been heard even from the bench, that, subject to the established rules, the duty of the court was to construe the will as a person of ordi-nary intelligence would do, and that no such person would doubt that in this case the testator intended the widow to have a life estate. 'Of course,' said the L. J., 'we are bound by the rules which have been established by the courts to enable us to say what the words used do mean. Subject to that, we are bound to construe the will as trained legal minds. And that differs from the mind of an ordinary person in this way, that even per-sons of ordinary intelligence not so trained are accustomed to jump at the conclusion as to what a person means by the words he used, by fancying he must have done what they, under simi-lar circumstances, think they would have done. . . . That is conjecture only, and conjecture on an imperfect knowledge of the circumstances; because, although, if the facts before them and in evidence were all the facts, they may think that they would have taken a particular course, yet it does not follow that all the facts known to the testator are in their minds, or in evi-dence before them, or that the testator's mind was in any way constituted as regards the attention he paid to the rights and claims of the different parties dependent on him as their minds

are constituted, or that he would have acted in the same way as they.    Therefore, as lawyers, we must construe the will like any other document, with one difference only, namely, that tech- nichal words are unnecessary in a will.' "

These cases have been selected as the clearest statements of the law for and against devises by implication.    A multitude of other cases have been cited by learned counsel on both sides, every one of which has not only been read, but carefully studied. Out of all this mass of learning, the true purpose should be to derive some general principles supported by settled authorities for our guidance in the construction of this will.    If any one thing can be evident, after the review of the authorities, it is what Sir William Jones said more than two hundred years ago, that no will has a brother."    Every will must be determined upon considerations pertaining to its own peculiar facts and terms alone.    One of the propositions most earnestly insisted on by the appellants is that, where there is a bequest to a person, and if he shall die without having children living at his death, then over, this does not raise an implied gift in the children, but that the parent takes an absolute interest defeasible on his dying with- out having had, or without leaving, a child, as the case may be. This is quoted from Jarmon on Wills (6th Am. Ed.), vol. 1, 555, 556.    Mr. Jarmon states that the reason of this construc- tion is that the rejection of the implication in such a case is not productive of any absurdity, for, say he, "It supposes the tes- tator, by making the interest of the legatee indefeasible on his having or leaving a child, to intend that if there are children he shall have the means of providing for them," and this rule is thus stated in all the text-writers; but that is the case of the first taker taking the absolute interest, and not any less interest.    It is like the case *supra Dowling v. Dowling,* and it is also like the case of *Boling v. Miller* (Sup. Ct. Ind.; decided Feb. 18, 1893), 133 Ind. 602, 33 N. E. 354, and the very important case of *Baker v. McLeod's Estate* (Sup. Ct. Wis.; decided May 5, 1891) 79 Wis. 534, 48 N. W. 657, the opinion being by the very

learned Judge CASSODAY, in the course of which Judge CASSO-
DAY gives approval to the following quotation from the opinion
of Judge ANDREWS in *Vanderzee v. Slingerland,* 103 N. Y. 54,
8 N. E. 249, 57 Am. Rep. 701, which we also heartily indorse to
this effect: "It may be safely assumed that, where a will is
dictated under the influence of family relations, it would sel-
dom happen that a testator would intentionally cut off the issue
of a son or daughter from taking the share of the parent in his
estate for the benefit of collateral objects." We think this an-
nouncement of Judge ANDREWS is the announcement of a
great and correct legal principle, to which too much heed
cannot be given; and in the case of *In re Application of N. Y.,
etc., v. Van Zandt,* 105 N. Y. 89, 11 N. E. 492, 59 Am. Rep.
478, the provision of the will was this: "I direct that in
case my daughter Minnie should die without issue, that
my real and personal property should be possessed and enjoyed
by my husband and my sister during their natural lives, and
after their death, the real and personal property to be divided
equally between my four brothers (naming them), share and
share alike; the devise over to my husband, sister and brothers
to depend upon the contingency of my daughter Minnie dying
without issue." The court held that Minnie Van Zandt took
under her mother's will a base or conditional fee, defeasible on
her dying without leaving issue living at the time of her death;
that her issue, should she leave any, would take by inheritance
from her, but that a conveyance by her in her lifetime would be
effectual as against her children. We call especial attention to
this case as being also identical with *Halsey v. Gee,* 79 Miss.
193, 30 South. 604. Minnie took an absolute interest, defea-
sible upon the contingency named, not a life estate. In the
case of *Cassell v. Cooke,* 8 Serg. & Rawle (Pa.) 268, 11 Am.
Dec. 610, the testator devised to his son, George Stewart, a plan-
tation as soon as he arrived at the age of twenty-one, not saying
what interest he gave, but giving generally, and then adding,
"If my son, George Stewart be removed by death before he is

of age, his part only shall fall to my two daughters." It was held that George took an absolute interest defeasible upon his dying under twenty-one, and this strong language is used in the opinion of the court: "The whole doctrine of the effect of the words, 'If he should die under twenty-one,' is fully stated" in *Bramstone's Lessee v. Holladay,* 1 W. B. L. 335, 3 Burr. 1618, it clearly appears that the giving over on a dying before twenty-one shows an intention that, if the party attain twenty-one, he shall have a fee-simple, and this case is approved in *Busby v. Busby,* 1 Dall. 226, 1 L. Ed. 111, as a leading one, on the general doctrine of a devise by necessary implication: "Let any man ask himself this question: 'What did the testator mean when he said if my son George be removed by death before he be of age his part to fall to my two daughters?' His answer most assuredly would be that he intended by these words that if he arrived at that age he should have the power of disposing of it as he pleased, and, if he died without disposition leaving heirs, it should descend to them; that the limitation over depended on one contingency—his death within age. This is not a construction by conjecture, but one arising from the words themselves on the most necessary implication." The last four cases are of very great importance as settling the point as stated, where the first taker takes an absolute interest; and it is upon the principle announced in these four, *supra,* that *Halsey v. Gee,* 79 Miss. 193, 30 South. 604, rests. The interest there given to the first takers was general and absolute, defeasible, however, upon the happening of the contingency named. There was not there any life estate, or any less estate than an absolute one, defeasible, however as stated. *Halsey v. Gee* is perfectly sound on that principle, but it is not a case proceeding at all upon the line of decision with the two Tennessee cases so much relied on by appellant of *Nott v. Fitzgibbon,* 107 Tenn. 54, 64 S. W. 26, and *Owen v. Hancock,* 1 Head (Tenn.), 563.

But in this will, the one thing that stands out clear and distinct and unmistakable—the mountain in the landscape of the

will, so to speak—is the express and positive direction, thrice
repeated in the will, that Julia shall not have anything beyond
a life estate, either in the half first devised to her, or the half
she was subsequently to take from her mother; that one para-
mount purpose dominates the whole structure of this will, and
to that purpose all else must be made to bend, so that it is idle
to cite authorities as to what would be the construction had
Julia taken an absolute interest.    It is perfectly clear that she
cannot take under this will, either by descent or by purchase,
any fee of any kind.    It was the clear purpose of the testator
to limit her, at all events, to a life estate.    The very reasons
urged with so much ingenuity and force by the learned counsel
for appellant to show that the testator had an overshadowing
fear of Julia's husband ever becoming possessed, in any man-
ner whatever, of any interest whatever in the estate devised to
Julia furnish, themselves, the strongest ground for holding that
Julia should have only a life estate, should never take a fee
either by descent or by purchase, and should never have the life
estate that she had enlarged by construction into a fee upon the
birth of issue.    So to hold would be absolutely to nullify the
paramount provision of the will limiting Julia strictly to a life
estate.    What, then, is the law where the first taker, like Julia,
gets only a life estate?    Mr. Jarmon says, in the passage above
quoted, on page 556, in the first volume of his great work, as
follows: "And even where the language of the will necessarily
confines the interest of the parent to his life, the children will
not generally be held to take by implication; it is extremely
probable that the testator intended a benefit to them; but *si
voluit non dixit.*    But it seems that in such a case the court will
lay hold of slight circumstances to raise a gift in the children,
and thereby avoid imputing to the testator so extraordinary an
intention as that the devisee or legatee over is to become en-
titled if the first taker have no child, but that property is not
to go to the child, if there be one, or its parent.    Thus, where
a testator having by his will bequeathed one thousand pounds

to his niece A. by a codicil, reciting that she had married in-
discreetly, and that he intended to withdraw the legacy out of
her power to dispose of it, and out of the power of her husband
so to do, did therefore direct his executors to secure his said
niece the interest of the said one thousand pounds independ-
ently of her husband, by placing out that sum in trust for his
niece, she to enjoy the interest or dividends during her life,
and at her decease, without child or children, the principal and
interest to be divided among such of her sisters as should be
then living.    Sir T. Poumer, V. C., was of the opinion that
by the combined effect of the will and codicil he was justified
in saying that the children took the legacy by necessary impli-
cation."    And this rule has been steadily followed in many
cases of great consideration; as, for example, in the case of
*Sturges v. Cargill,* 1 Sandf. Ch. (N. Y.) 318, where the court
held that there the language of the will necessarily confined the
interest of the parent to his life.    The courts in construing
wills, will lay hold of slight circumstances to raise a gift in the
children to avoid imputing to the testator the extraordinary
intention of giving the property to the devisee over, and leaving
the issue of the tenant for life unprovided for.    In that case
Cargill, by his will, after providing for his wife, divided his
real estate into five equal parts.    He gave one of these five
parts to his executors in trust for the use of the wife of his son
Henry during her life, and on her death the estate was to de-
scend to Henry's children.    The other four portions were given
for the use of four other children.    Now, it happened that
Jane, at the date of the will, the wife of Henry Sturges, the
son, had a large family of children, and because the will clearly
showed the intention to be to deal with all alike, and there was
an absence of any reason for cutting off Jane and Henry's chil-
dren, it was held that the trustees took in trust for Jane for
life, with remaining to her children; the court working this in-
tention out of nothing but the mere environment of the parties
and the general frame and scheme of the will.    This case does
not seem to be referred to by either side in their briefs.

The case of *Kinsella v. Caffrey,* 11 Irish Chancery Reports, 154, is exceedingly strong for the devise by implication, as is the case of *In the Matter of Vowers,* 113 N. Y. 569, 21 N. E. 690, and *Aspy v. Lewis,* 152 Ind. 594, 52 N. E. 756. The case of *Langston v. Langston,* 2 Clark & Finnelly, 194, is also a case of the strongest sort for the devise by implication.

What, now, are the considerations or circumstances which the court in this case should look to as showing, since Julia's estate was limited strictly to life, a remainder in fee by implication in the children of Julia? Some of them are as follows: First and chiefly, that Julia's interest was limited strictly to her life. This we regard as controlling in the construction of this will. Second, there was an exclusion, by the terms of this will, of all the marital rights of any husband that Julia might have, and especially an exclusion of any right he might have to inherit through the death of any child of his and Julia's. It woud have been far more likely, on the doctrine of probabilities, that such husband might inherit from such child if Julia should be held to take a fee in any view, than if she should be limited strictly to a life estate, and the children should only take the fee absolutely after they became of age or married. The father would be much more likely to have died when this latter period came around than while Julia herself might live. Again, the fact that Hunt, by his will, provided that Bettie Hunt Selden, if Julia died without child, or if such child died before marriage or before coming of age, should take the limitation over; and he made the same sort of ulterior limitation as regards Julia Moore Driver, the other ulterior limitee. The carefulness and solicitude and anxiety manifested by Hunt to dispose of his estate, not only for life to Julia, but to provide three ulterior destinations in certain contingencies named, signalize his set purpose not to die intestate as to any part of his estate, and, consequently, his necessarily involved purpose that Julia should never take a fee of any sort of inheritance or purchase from him. And unless there was a limitation my implication to the children of Julia, then upon the com-

ing of age or marrying of any such child, which would cut off the ulterior limitation to others, there would result necessarily an intestacy as to the remainder in fee, and Julia would, of course, take that by descent, and not as a purchaser under the will. This cannot possibly be the proper construction of this will; for in that case there would be nothing to prevent the husband from inheriting from Julia, which was most sedulously and stringently guarded against by this testator. It is said by the learned counsel for appellant that this will must have been drawn by a skilful lawyer, learned in the law of wills. We confess that a most careful study of this will has brought us to the exactly opposite conclusion. We think it is manifest that this testator thought when he wrote the will—it is a holographic will—that Julia's husband would have curtesy somehow or other in the estate she took. He could not have had any curtesy in a life estate, of course, and yet he certainly thought so, and attempted to provide against it. Nor could he have had any curtesy in a determinable fee.

The very essential nature of an estate by curtesy forbids any such view of the law. Again, it is manifest that it was the testator's thought that he could limit the right of the father of the children to take by inheritance from them. This is a thoroughly erroneous view, and yet he entertained it, as witness the provision that he should not inherit through the death of any child, etc. Again, it is impossible to read this will without seeing that it was the manifest purpose of the testator to dispose of his whole estate, and not die intestate as to any part thereof. He did not intend that Julia should take anything by inheritance from him arising out of any partial intestacy. It is to be remembered that the rule laid down by Judge ANDREWS in 113 N. Y. 569, 21 N. E. 690, *supra,* is strong to show that, where the limitation is over to a third person not related to the testator in blood, it is safely to be assumed that he did intend to preserve his bounty for his own blood, if that construction can reasonable be indulged. If the children of Julia were not intended to take a fee in remainder by implication, manifestly this es-

tate went to strangers to the bood of Hunt, the testator.    It must also be kept carefully in mind here that the limitation is not simply over to third persons on the default of children, but on that default, plus the other contingency, that such children should die under twenty-one years of age, or before they marry —two contingencies in fact.    Less than this was held in *Kinsella v. Caffrey* to raise the estate by implication.

It is earnestly argued by learned counsel for appellant that under the decisions of the supreme court of Tennessee, to be noted later, there was a devise here by implication, but that that implied devise is not of the remainder in fee to the children, but of fee to Julia; that is to say, that, upon the birth of issue, Julia's life estate was, by implication, enlarged into a devise in fee.    And it is urged, which is true, that the courts will go further in implying a devise of an added interest to one to whom some interest has already been devised than they will to imply a devise, or, as it is said, create a devise in one to whom nothing had been previously devised.    This abstract legal proposition may be conceded, but the complete answer to this line of argument is that if the court is driven, in this case, to imply some devise, it should most assuredly imply a devise in harmony with the perfectly plain, paramount purpose of limiting Julia strictly to a life estate, which devise would necessarily then be a devise of the remainder to the children of Julia.    Assuredly, in the face of the thrice-repeated purpose to limit Julia to a life estate, and in the face of the most anxious purpose to exclude the husband from any possible interest in his estate through the children or through Julia in any manner whatever, it would be a most extraordinary construction, and a most flagrant perversion of the purpose of the testator, to hold that there is an implied devise here to Julia of a fee upon the birth of issue.    It must be kept in mind that this will does not stop with giving the estate to Julia for life, and, if she dies without issue, over to Bettie Hunt Selden, but it was essential that the children should die under age or not marry.

It is earnestly insisted by the learned counsel for appellant that the only mention of Julia's children in this will is by way of prevention of inheritance by Julia's husband of property, either through them or lack of them; and counsel stresses as the great controlling purpose of this will the idea that the husband was never under any circumstances, to take any interest in any way. It is undoubtedly true that this was a leading purpose of the will, but it is just as clear that the testator's mode of effecting this was to limit Julia's estate to life and leave the children to take the remainder in fee by implication. The one dominant thought in the will is the limiting of the estate Julia takes to her life strictly. If she should die without children, the husband could not then take, because the fee went over to ulterior limitees most carefully provided for. If Julia had children who arrived at age or married, which was the event which took place in this case, while no express gift is made to these children, it is incredible that the father should intend to strip them of any interest as soon as they should marry or come of age. This cannot be a sound construction. We think the learned counsel for appellant has too much stressed the anxiety of the testator to cut the husband out, in what they have to say about his curtesy in his wife's estate and about inheriting from his children. These are mere blunders as to what the law was on the part of this testator.

There is a principle of law, as correctly stated by learned counsel for appellant, that the courts will more readily sustain a devise by implication to children upon arriving at age or marriage, where some beneficial interest had been given them during minority, than where no interest of any kind has been given them. Authorities are cited to this principle, and it is a sound principle within proper limitations, but it must be carefully guarded in its application to the terms of each particular will considered. It is very likely to be overstressed in the case of a will where it is plain that the children are mentioned in merely stating a contingency, upon the happening of which the devise over will take effect. Of course, wherever this last sort of pro-

vision clearly appears, there cannot possibly be any devise by implication; but where the devise by implication is to be maintained or not upon nothing but the naked test whether any interest is express and given to the children during minority, it is a test of exceedingly dangerous and delicate application, and it will be found on a careful examination of authorities that a devise by implication to children on arriving at age or marriage is maintained in many cases where there is nothing in the will to show any present interest devised to them, equitable or legal, during minority, such implication in such cases being worked out by the court as the plain result of the whole scheme or frame of the will of the testator.

We have most carefully and anxiously weighed the three expressions in the will from which learned counsel for appellant argue the implication must be derived, if it is derived at all, and, whilst the reasoning is exceedinglly ingenious and well supported as to the abstract principles announced, it is clear that, looking to the frame of this will, its manifest scheme and design and purpose as a whole, there is discoverable upon its face the purpose to benefit these children, and there does arise a necessary implication of a remainder in fee in these children. Finally, the learned counsel for appellant most earnestly insist that the intention of the testator must be ascertained from the decisions of the supreme court of Tennessee, the state of the testator's domicile, and the learned counsel for appellee apparently concede this contention in its entirety. The rules of construction and interpretation are very accurately set forth in volume 22 of Am. & Eng. Ency. of Law (2d ed), at page 1366 *et seq.* The land in this case is in the state of Mississippi. Nothing can be better settled than that the title to real estate is governed solely by the law of the place where the property is situated, but it is said correctly on page 1307, (b), as follows, touching the particular rule involved: "Where the inquiry, is directed solely to the ascertainment of the meaning and intention of the testator from the language employed by him in the will,

the *lex domicilii* controls." In note 3 to this section it is said, referring to the principle that the title to real estate given by will is governed by the law of the place of the *situs,* that a different rule seems to obtain in Mississippi, since there it was held, in *Crusoe v. Butler,* 36 Miss. 173, that "the nature, obligation, and interpretation of the instrument, and the rights and powers arising under it," must be determined by the law of the domicile. This is a just criticism of that case, in so far as the words "rights and powers arising under the will are concerned," for the court evidently mixed the two rules' of construction in that inaccurate language. In volume 30 of Am. & Eng. Ency. of Law, at page 602, it is said: "It is also the legal, not necessarily the actual, intention, which governs." This is a confusing and misleading statement, as the authorities cited show. The principal case referred to under this citation is the case of *Martindale v. Warner,* 15 Pa. 471. That case was just this: The testator made a will by which he devised the remainder of his estate to two brothers as residuary legatees, and they both died before he did, leaving children. At the time of the making of this will the law was that these residuary legacies lapsed, and did not go to the children of the residuary legatees. But the legislature passed an act, after the will was made on May 6, 1844, changing the rule so that the children would take. The testator lived long after this law was passed. This law on its face provided that it should apply only to wills made after its passage, and the court held, of course, that the law in force at the time of the making of the will governed. The court said, on page 480: "I do not put the case on the actual intention of the testator, but on his legal intention, which is the only safe rule. That the testator permitted his will to stand without alteration for several years, or that he may have known of the act of 1844, is nothing. It is a question of construction, depending on certain fixed principles, which ought not to be varied by fancied speculations as to the knowledge or ignorance of testators, some of whom may, or others may not, know of the statute and

its legal construction." It is perfectly obvious that all that the court meant in this case, and that all that the court meant in the *Crusoe case,* and in the other three Mississippi cases cited, and in all cases announcing this particular principle about the difference between legal intent and actual intent, is, as stated in the passage above cited from volume 22 of Am. & Eng. Ency. of Law, that where the inquiry is solely to ascertain the intention of the testator, from the language employed by him in the will, what the courts of the state of his domicile have said those words will mean, will control. What the courts will concern themselves about, wherever a will is under review, is the ascertainment of the testator's actual intention; what he himself meant, not what the law presumes him to have meant. In strict reasoning, a testator can have but one intent—his own actual intent. To speak of a testator's legal intent is strictly a solecism; there is no such thing. So that, when it is said that a testator's legal intent is to be gathered from the decisions of the court of his domicile, nothing more is meant than that whatever his actual intent may have been, if he has used in his will certain technical terms to which the courts of his domicile have attached a crystallized and settled judicial meaning which has become a rule of property in that state, then such will, wherever it comes under construction in other states, will have the same meaning given to those technical words which the courts of his domicile gave them. That is absolutely what this phrase "legal intent" means, and this rule about the legal intent being governed by the courts of his domicile means. In truth, we should not speak of anything but the testator's actual intent, for that is all the testator ever had, so far as he is concerned. If that intent violates no law, it stands; if it violates the law, the will fails; unless the legislature has arbitrarily said, or the courts have by long construction said, notwithstanding his actual intent, a certain meaning shall be given to certain technical terms which he has used, which meaning shall save the will, although it may result in a different disposition from that

which he intended. This principle finds no better illustration than in the now long-settled rule of construction, flowing from legislative enactment, that the words "children," "heirs," etc., which import at common law an indefinite failure of issue, shall not import an indefinite, but a definite, failure of issue, etc., making the words "issue," etc., mean issue, etc., living at the time of his death. In all such cases the actual intent was to create an estate tail, but the law, to save the purpose of the testator as far as possible, makes the failure of issue definite, and thus prevents an estate tail arising by construction. Now, this legislative declaration, followed by judicial construction, is what all these books mean by the legal intent, but it is plain that the phrase "legal intent" is a misuse of words, and that what is meant by the legal intent of the testator is simply the intent of the law; that is to say, the meaning the law imputes, whether the legislature or the courts, to the technical terms he has used in his will, not knowing their legal effect. In other words, where the testator has an actual intent that the law cannot effectuate, the law, in order to effectuate it as far as possible, gives to technical terms in his will a meaning that should save it so far as possible; but to call this construction of the law a legal intent of the testator is, as stated, purely and simply a solecism. There is no such thing as the testator's legal intent in this sense; so that the rule invoked by learned counsel for appellant means nothing more than that where, in a will, a testator has used certain technical terms, which terms have acquired, in the domicile of the testator, a fixed and unchangeable meaning, thus becoming a rule of property, these terms in such will, in whatever state the will is up for construction, shall be given, in the interpretation of the will, the meaning that would be given them by the courts of his domicile. The United States supreme court well said in *Smith v. Bell,* 6 Pet. 68, 8 L. Ed. 322: "The construction put upon words in one will has been supposed to furnish a rule for construing the same words in other wills, and thereby to furnish some settled and fixed rules

of construction which ought to be respected. We cannot say this principle ought to be totally disregarded, but it should never be carried so far as to defeat the plain intent, if that intent may be carried into execution without violating the rules of law. It has been said truly that cases on wills may guide us as to general rules of construction; but unless a case cited be in every respect directly in point, and agree in every circumstance, it will have little or no weight with the court, who always look upon the intention of the testator as the Polar Star to direct them in the construction of wills."

Now, the two cases cited from Tennessee, *Owen v. Hancock,* 1 Head, 563, and *Nott v. Fitzgibbons,* 107 Tenn. 54, 64 S. W. 26, do not construe wills at all identical in their terms with the will under review here. What are those cases? *Owen v. Hancock* was this: A testator devised to his daughter, Mary Cooper, a negro named Celia during her lifetime, and, if she should die without any heirs born of her body, the said negro girl and her increase should return to his estate and be equally divided among the rest of his children. The first thing to be noted is that the words "heirs born of her body" are strictly words of entail, which would, under the old construction, create an estate tail; whereas, the words "children" in this will plainly mean the direct descendants; that is to say, the children only of Julia, and import a definite failure of issue. Second, in that case there was no ulterior limitation over to strangers to the blood of the testator; here, there is. Again, the court in that case expressly held that there was no difference as to raising the implication between the case where the first taker took an absolute interest, and where he took only a life estate. We have shown that this is not sound. The court reached the curious result in that case of first denying that there was any devise by implication of the remainder to the children of Mary Cooper, and yet in the face of a positive provision that her interest was limited to her life did raise a devise by implication of the fee to Mary Cooper, in the very face of the express declaration that she was to take

only a life estate. However correct the result reached in that case, it seems to us it would have been far sounder, since an implication was to be raised, that there should have been an implication in favor of the children. In the case of *Nott v. Fitzgibbons,* while following the case of *Owen v. Hancock,* in another case where the estate was directly given to James Fitzgibbons for his life only, holding that this life estate in the son was enlarged by implication into a fee in the son, the court also proceeded to rest its judgment upon another line, which was this: It quoted from *Nachell v. Welding,* 8 Sim. 4, a devise to a son for life, and if the son should die without issue, then over, and approved an announcement from that case to this effect: "That whether an estate be given in fee, or for life, or generally without any particular limit as to duration, if it be followed by a devise over, in case of the devisee dying without issue, the devisee would take an estate tail;" and the court actually held, as we understand it, that because the devise to James Fitzgibbons provided for a devise over, in case he should die without issue, that, therefore, that was the devise of an estate tail, and so it was converted under their statute into an estate in fee in the first taker, James, who might, therefore, lawfully alien the property, and this, too, although there was at the time a statute in the state of Tennessee like our statute, construed in *Banking Co. v. Field,* 84 Miss. 646, 37 South. 139, providing that the words "without issue" in such connection would mean without issue living at the time of his death, which legislative construction, of course, prevented the arising of an estate tail under the old rule. It is obvious that this decision, resting upon the old construction and ignoring the statute, can have no influence upon this will, where the limitation over is upon the death of the life tenant, "without children, or if the children die unmarried and before the age of twenty-one," which expressions clearly import a definite failure of issue. They are words of purchase, and not of descent. They are not used interchangeably with the word "issue," as was the case in *Jordan v. Roach,*

32 Miss. 481. It is obvious that in both *Owen v. Hancock,* and *Nott v. Fitzgibbons,* the Tennessee court held there was no intestacy, and did raise a devise by implication by enlarging the life estate into a fee. In this case it is clear that there is no intestacy from the whole frame of the will, but the implication from all the language in this will is as clear as can be of a remainder in fee by implication to the children. To hold here on the terms of this will that the life estate of Julia was enlarged into a fee is to fly in the face of the positive declaration, thrice iterated by the testator, that Julia was to have only the life estate, and thus to make for the testator a will, instead of construing one that he did make.

One other observation is due to be made about the case of *Nott v. Fitzgibbons, supra,* which is that that case was not decided until years and years after the death of this testator, and could not possibly have been in his mind at the time of the making of his will; and with respect to *Owen v. Hancock, supra,* there are one or two very important things to be further said: First, the case of *Owen v. Hancock* cites 2 Powell on Devises, 602, 20 Law Library, 321. The whole context of this citation has reference to the subject of estate for life where enlarged into an estate by implication. The author says: "It has long been settled that a devise to a person with a limitation over, if he die without issue, confers an estate tail. But, according to some early cases, an express estate for life cannot be so enlarged into an estate by implication, on the ground that implication can only be admitted in the absence of, but never in contradiction to, an express limitation." Again the author says, to which we call special attention: "It is to be observed that where the terms of a devise over refer to issue living at the death, it has no effect in enlarging a prior estate for life to an estate tail. The only question in such case would be whether they would raise an estate by implication in the issue living at the death." Now, this is the emphatic declaration of Powell in his work on Devises, in the very sections quoted by the supreme court of

Tennessee in the case of *Owen v. Hancock.* It must be perfectly obvious, therefore, that the supreme court of Tennessee could not have meant to hold that where in a will the failure of issue is definite, and where the first taker is thrice limited to a life estate, such life estate in the first taker is by implication enlarged into a fee. The supreme court of Tennessee never has yet held that, and we do not think ever would. Indeed, in this very case of *Owen v. Hancock,* the supreme court says, 1 Head (Tenn.), 566: "A devise over after the death of the wife, or the arrival at age of a child, without expressly giving them any estate, would confer, by necessary implication, an estate for life or during minority." It seems clear, therefore, that the Tennessee authorities never have held what learned counsel for appellant claim, where the will made the failure of issue definite. For that reason, and two other reasons, they do not bind us: First, because the terms of the wills construed there are not identical or substantially like the terms of the will here, taking all its terms into view as we must; second, because the only effect of the rule in construing a will made by one domiciled in Tennessee that we are bound as to the intent of the testator by what the courts of his domicile say, is that we are so bound, not as to his actual intent, but as to what the technical terms he may have used in his will mean, where that meaning has been crystallized into a rule of property; whereas, here in this will, taking as a whole, there is no room for the play of this doctrine of construction of the will from the meaning of technical terms. The actual intent of the testator here is plain that Julia shall take an estate for life only. There is here a manifest definite failure of issue, and there are other provisions of the will, to wit, the ulterior limitations over to strangers to the blood of the testator, and the provision seeking to cut out the husband, which are decisive against the view which is urged by the counsel for appellant.

On the whole case, it is clear from the entire frame of this will, looking at all its parts and giving every word its due force, that this testator intended these children of Julia to take a re-

mainder in fee. The implication is necessary from the whole scheme of the will; no other rational purpose can be assigned to the testator; and this opinion is closed with the exceedingly striking and forcible and apt language of Lord Brougham in *Langston v. Langston,* 2 Clark & Finnelly, 194. In that case the scrivener had, by accident, omitted a line in the will providing an estate for the first son. It was conceded that no estate whatever was given by the terms of the will, and that the court could not reinstate the omitted clause. Lord Brougham, in delivering his opinion giving the eldest son an estate by implication from the construction of the whole will, among other things said: "The third of the reasons is one which, I cannot help feeling to be exceedingly powerful, and which, upon all the views I can take of this subject, presses forcibly upon my mind. The existence of a son is to defeat no less than eight terms raised most carefully, artifically, and anxiously by the person who penned this instrument; and yet that son, whose existence is to produce such an effect, to create such destruction, to deal about such havoc upon the whole of this will, according to the construction set up by the King's Bench and by the appellant, not to benefit it in the slightest degree. My lords, it is monstrous to suppose that any rational person could really intend to make so much depend upon the event of a person coming into existence, which person, nevertheless, was to be of no force, of no effect, of no value in his eyes, except to be used as an instrument of destruction; that he was only to be considered as the means of taking away the benefit of other parts of this instrument, yet was himself to benefit nothing by that destruction."

This case has been argued with the most consummate ability by learned counsel on both sides. We acknowledge ourselves greatly indebted to them. The result is that, since the action of the court below in overruling the demurrer is in accord with the views herein expressed, the decree of the court below is hereby affirmed, and the cause remanded for an accounting.

*Affirmed.*